**Marvin L. WARNER, Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant.**

No. C–1–82–1081.

United States District Court, S.D. Ohio, W.D.

Dec. 7, 1984.

---

**1.** The presentence report also noted that Goehl had seen his parents twice in the year prior to the July, 1984, report.

Kevin E. Irwin, Cincinnati, Ohio, for plaintiff.

Gerald Baldwin, Arnold Morelli, Cincinnati, Ohio, for defendant.

FINDINGS OF FACT, OPINION, AND CONCLUSIONS OF LAW

CARL B. RUBIN, Chief Judge.

This matter is before the Court for determination on its merits.[1] Plaintiff seeks return of $249,075 paid to defendant, while defendant in a counterclaim seeks $103,950 from plaintiff as his proportionate share of a delinquent loan. Hearings on Motions for Injunctive Relief were held on November 3, 1982, November 29, 1982, December 27, 1982, and August 27, 1984. Pursuant to Fed.R.Civ.P. 65(a)(2) and by agreement of the parties, the Court will include all evidence presented at such hearings in this determination of the merits. In accordance with Fed.R.Civ.P. 52, the Court does submit herewith its Findings of Fact, Opinion, and Conclusions of Law.

## I. Findings of Fact

(1) In the fall of 1980, plaintiff, Marvin Warner, an investor experienced in banking and real estate, agreed to purchase an interest in a limited partnership known as High Plains Drilling Partners 1980–II, Ltd. ("High Plains"). The partnership intended to purchase and lease four oil drilling rigs.

(2) The partnership was put together by Carl Swan, Chairman of the Board and a Director of High Plains Company, an Oklahoma corporation that acted as the general partner of High Plains.

(3) Plaintiff purchased 15 limited partnership units representing 15% of the partnership. The total purchase price was $498,-150. Plaintiff was given the option of paying the entire amount in cash and short-term notes or paying half in cash and short-term notes and the other half through a complex financing arrangement whereby High Plains borrowed the partners' contributions from Penn Square Bank, N.A. ("Penn Square") secured by irrevocable standby letters of credit, promissory notes, and loan assumption agreements in favor of High Plains. All of the limited partners elected the latter option. The loan thus obtained was known as the "Equity Loan."

(4) A Private Placement Memorandum ("Placement Memo") described the ar-

---

1. A previous Motion for Preliminary Injunction by plaintiff was denied and such denial affirmed by the United States Court of Appeals for the Sixth Circuit, 715 F.2d 1121 (1983).

rangement (Pltf's. Ex. 1). It indicated that the limited partners' promissory notes would be payable in quarterly installments over four years. Proceeds from these payments would be used to repay the Equity Loan from Penn Square. The memo anticipated that such loan would likewise be due in quarterly installments and would bear a floating interest rate of three and one-half percent over Penn Square's prime rate.

(5) The Placement Memo required that the letters of credit extend to June 30, 1985 and cover 110% of the principal amount of the limited partners' promissory notes.

(6) In the Placement Memo and in the Subscription Agreement (FDIC Ex. A) whereby plaintiff actually purchased his partnership interest, plaintiff was expressly warned about the speculative nature of the investment and the "high degree of risk of loss" involved.

(7) The Subscription Agreement required as part of the loan purchase option a letter of credit on the same terms as those stated in the Placement Memo.

(8) On October 29, 1980, plaintiff executed the Subscription Agreement along with a Power of Attorney, a promissory note for $249,075 payable in accordance with the terms set out in the Placement Memo, an Equity Loan Assumption Agreement, and a Working Loan Assumption Agreement.

(9) Under the Equity Loan Assumption Agreement, plaintiff agreed to assume personal liability for a pro rata share of High Plains's $1,660,500 Equity Loan from "a national commercial bank." The terms of that Equity Loan were to be the same as those set out in the Placement Memo. Plaintiff also agreed under the Equity Loan Assumption Agreement to execute a letter of credit in the amount of 110% of the principal amount of his share of the Equity Loan as security for the loan.

The Equity Loan Assumption Agreement contained the statement that the lender was not a party to it nor had the lender any obligations thereunder. The Subscription Agreement and the Placement Memo each stated that Penn Square was looking to the limited partners' letters of credit as the primary security for the Equity Loan. (FDIC Ex. A at 33; Pltf's Ex. 1 at 10).

(10) On December 30, 1980, High Plains and Penn Square entered into a Secured Term Loan Agreement for the Equity Loan. The terms of this $1,660,500 Equity Loan were different from those represented to plaintiff in the Placement Memo and Equity Loan Assumption Agreement. Instead of a 48-month, three and one-half percent over prime loan payable in quarterly installments, the actual loan was for 19 months, with interest at one and one-half percent over prime, and the entire principal payable on August 15, 1982.

(11) The letters of credit demanded by the Secured Term Loan Agreement were also different. They were to cover only 100% of the principal amount instead of 110%. (Pltf's. Ex. 5 at 12).

(12) The actual terms of the Equity Loan differed from those represented in the Placement Memo and the Equity Loan Assumption Agreement because banks were reluctant to issue the limited partners letters of credit for longer than two years. As a result, most limited partners could not obtain 48-month letters of credit. Since Penn Square refused to make High Plains an unsecured loan, the parties to the Equity Loan restructured it into a 19-month "bullet loan" at a lower interest rate and adjusted the letter of credit and promissory note requirements accordingly.

(13) There was an "understanding" among the parties that at the end of the 19 months the Equity Loan would be rolled over and letters of credit would be renewed for another two years. Most of the Equity Loan was later sold to Continental Bank, N.A. of Illinois.

(14) In a letter dated November 13, 1980, plaintiff was informed of the financing problem by Brent Davis, Vice President of High Plains, and advised to have his bank prepare a two-year letter of credit on Penn Square for $249,075. Plaintiff ordered the Central Trust Company, N.A. of Cincinnati ("Central Trust") accordingly and the letter issued December 9, 1980.

(15) The actual Equity Loan did not require quarterly payments as had been anticipated by the Placement Memo and Equity Loan Assumption Agreement and as a result plaintiff was informed that he was not required to make quarterly payments on his promissory note to High Plains as its terms indicated.

(16) During the course of 1981, High Plains prospered. Its rigs experienced a utilization rate of 97.5%. By December of 1982, however, the demand for rigs had dropped dramatically and none was in operation. (Novakowski Depo. at 137).

(17) High Plains defaulted on the Equity Loan when it came due August 15, 1982.

(18) On July 5, 1982, pursuant to 12 U.S.C. § 1291, the Comptroller of the Currency determined that Penn Square was insolvent. Defendant, the Federal Deposit Insurance Corporation ("FDIC"), was appointed Receiver of Penn Square and now stands in its shoes.

(19) On October 13, 1982, the FDIC notified Central Trust of its intent to call plaintiff's letter of credit. After legal proceedings in the Common Pleas Court of Hamilton County, the United States District Court for the Southern District of Ohio, and the United States Court of Appeals for the Sixth Circuit, Central Trust honored the letter of credit on September 13, 1983.

(20) FDIC is the only remaining defendant in the case.

There remain but two questions for the Court to determine: (1) is plaintiff entitled to recover $249,075 from FDIC, and (2) is plaintiff liable for his share of the defaulted working capital loan.

## II. Opinion
### A.

■ The Court has jurisdiction over this matter pursuant to 12 U.S.C. § 1819 (1982). In cases involving the rights of the United States arising under nationwide federal programs, federal law governs. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). Such cases include those in-

volving the FDIC as receiver of a national bank. *D'Oench, Duhme, & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). When, as here, no federal statute provides the appropriate rule of decision, it is the Courts' task to "fill the interstices of federal legislation 'according to their own standards.'" 440 U.S. at 727, 99 S.Ct. at 1458 (*quoting Clearfield Trust Co. v. United States*, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943)). This involves a choice between adopting state law or fashioning a nationwide federal rule. *Id.* 440 U.S. at 723, 99 S.Ct. at 1455. Resolution of this question depends upon the balancing of three factors: (1) whether the federal program was one which, by its nature, required nationwide uniformity, (2) whether adopting state law would frustrate the specific objectives of the federal program, and (3) whether applying a federal rule would disrupt commercial relations predicated on state law. *Id.* at 728–29, 99 S.Ct. at 1458–59; *Gunter v. Hutcheson*, 674 F.2d 862, 868 (11th Cir.1982).

■ It should be noted from the outset that the parties here avoided this difficult question and variously briefed Oklahoma, Ohio, and Restatement law. They obviously have no preference, and well they should not because plaintiff's claims are grounded on relatively basic tort and contract principles. No federal common law has developed in these areas, and they are the traditional province of state law. In the absence of ready-made federal common law and in light of the general reluctance to displace state law without explicit statutory or constitutional direction to do so, the presumption is that state law is adequate and should be adopted by the federal court as the rule of decision. *See* 440 U.S. at 740, 99 S.Ct. at 1464; *FDIC v. Braemoor Associates*, 686 F.2d 550, 554 (7th Cir.1982). Such is the case here. There is no need in this instance for a uniform federal rule. Operation of the FDIC would not be frustrated by application of state law to this dispute, and fabrication of a federal rule would disrupt commercial relations predi-

cated on state law. Thus, we adopt state law as the rule of decision in this case.

■ This brings us to the issue of which state's law should apply. The Subscription Agreement, Equity Loan Assumption Agreement, and Working Capital Assumption Agreement specify that Oklahoma law shall govern them. No reason exists for rejecting that designation. High Plains and High Plains Company were organized under Oklahoma law. Penn Square had its principal place of business in Oklahoma City. Swan was a citizen of Oklahoma and the business of the partnership was conducted in Oklahoma and Texas. With Oklahoma the focal point of the dealings among the parties, its designation by them was appropriate. Oklahoma contract and tort law must be applied to the transactions in question.

### B.

■ In order to establish fraud in Oklahoma, plaintiff must prove (1) that defendant made a material misrepresentation, (2) with knowledge of its falsity or reckless disregard for its truth, (3) with the intent that plaintiff act on the misrepresentation, and (4) actual reliance on the misrepresentation by the plaintiff (5) resulting in injury. *D & H Co. v. Shultz,* 579 P.2d 821 (Okla.1978). Oklahoma recognizes an exception to the general rule that the misrepresentation must relate to existing or past facts. Promises as to future acts are actionable where the promise to act in the future is accompanied by an intention not to perform and the promise is made with the intent to deceive the promisee into acting where he otherwise would not have done so. *Citation Co. Realtors v. Lyon,* 610 P.2d 788, 790 (Okla.1980).

■ The theory of plaintiff's case stated in terms of Oklahoma fraud law, is that Penn Square conspired with Swan to deceive the limited partners into investing in High Plains when Swan and Penn Square knew from the start they could not obtain the promised financing for the project and when they knew the limited partners would not invest at the financing terms actually available. Plaintiff has failed to prove this theory.

The central pillar supporting plaintiff's theory is the fact that the Equity Loan was not made on the same terms represented in the Placement Memo and Equity Loan Assumption Agreement. Plaintiff would have the Court infer from this fact that plaintiff was defrauded. Without more, such an inference is unwarranted. Plaintiff's contract and partnership rights may have been breached, but without a showing of an intent to deceive on the part of Penn Square, and a showing that Penn Square made promises it did not intend to fulfill at the time the Placement Memo and Equity Loan Assumption Agreement were executed, no claim of fraud can succeed against FDIC. *See Citation Co. Realtors v. Lyon, supra.*

The total of plaintiff's evidence supporting the alleged fraud is as follows: (1) Swan, the architect of the High Plains endeavor, was a director and shareholder of Penn Square. (2) Swan had a close working relationship with William Jennings, Chief Executive Officer of Penn Square. (Swan depo. at 30–36). (3) Penn Square had expertise and experience in making energy loans of this type. (4) Statements of Jerry Novakowski, Vice President of High Plains Co., that he assumed that drafts of the Equity Loan Assumption Agreement would have been reviewed by William Patterson, Officer of Penn Square, and that Penn Square was aware of the terms of the Equity Loan Assumption Agreement before making the Equity Loan. (Novakowski depo. at 89). (5) Patterson would not testify on Fifth Amendment grounds. (6) The existence of an understanding between High Plains and Penn Square that the Equity Loan, due October 15, 1982, would be extended for an additional two years. (December 27 trans. at 102–05, Davis testimony). (7) Verbal representations by officers of High Plains that plaintiff's letter of credit was a mere formality and would never be called. (November 29 trans. at 12, Warner testimony). (8) The Secured Term Loan Agreement memorializing the Equity Loan stated that the

terms of the Equity Loan Assumption Agreement were incorporated by reference into it. (Section 9). (9) The four oil rigs owned by the partnership were encumbered in excess of their worth.

If all the above were taken as true, there is still no direct evidence that High Plains or Swan, much less Penn Square, made the promises to perform contained in the Placement Memo and Equity Loan Assumption Agreement with the intent not to perform them but instead intended to deceive the limited partners. At best, the evidence shows that Penn Square knew of the contract between High Plains and the limited partners but nonetheless made High Plains a loan at terms different from those represented in the contract. This action may have been a breach of plaintiff's partnership contract, but it certainly does not justify an inference of fraud.

The totality of the evidence leads to the more plausible conclusion that the plaintiff, a sophisticated banker and real estate investor, entered into a high risk, potentially high yield investment fully aware of its speculative nature.[2] The deal was only offered to those who could afford the potential losses and could fully appreciate the risks involved. Large tax benefits were also a consideration. *See In Re Longhorn Securities Litigation,* 573 F.Supp. 255, 273 (W.D.Okla.1983). When all the limited partners could not obtain four-year letters of credit as anticipated, and as were necessary because the loan was to be sold to another bank, the parties secured the best possible terms available and entered into an unwritten "understanding" for refinancing on the same terms in two years. Although the length of the Equity Loan was one-half the time represented in the Placement Memo, the interest rate was 2% less, the limited partners were released from their obligations to make quarterly payments on their promissory notes. The amount of the attendant letters of credit was also reduced from 110% to 100% of the pro rata share of the Equity Loan.

The oil rigs were then built and business begun. From the evidence presented, there is no reason to believe that had the oil market remained healthy, the Equity Loan would not have been refinanced and High Plains and its investors would not have realized large profits. As events occurred, just as High Plains had all four of its rigs fully operational and was at the pinnacle of its debt obligations, the bottom fell out of the oil market and High Plains was left with four idle rigs and Penn Square was left with one bad loan. Fraudulent financing did not cost plaintiff his investment. A drop in the demand for oil denied High Plains the income necessary to pay off its large debts.

■ Several items of plaintiff's evidence warrant further discussion. First is plaintiff's claim that he was induced into obtaining his letter of credit based upon representations by officers of High Plains that it would not be called. The evidence does not support a claim that the letter of credit was a mere formality. The Placement Memo and Equity Loan Assumption Agreement relied on so heavily by plaintiff in his fraud argument stated specifically that the lender looked to the letters of credit as the primary security for the Equity Loan. (FDIC Ex. A at 33; Pltf.'s Ex. 1 at 10). Bank officials asserted that they would not have made the loan without the letters of credit as security. Plaintiff himself testified that it would have been bad banking practice for a bank to make an unsecured loan of the type involved here and that the letters of credit would be necessary if Penn Square were to sell the loan to other banks as it did. (Warner depo. at 103; November 29 trans. at 12). So important were the letters of credit to the acquisition of the Equity Loan that it was completely restructured to conform to the time limitations of the shortest-term letters of credit. In

---

**2.** The first page of the Placement Memo states, "purchase of the units involves material risks and is suitable only for persons of substantial means who have no need for liquidity in this investment and can afford a substantial loss of their investment." The memo then devotes several different sections to specific areas of risk.

terms of the letters of credit only, the Court finds that the justifiable reliance element of a fraud claim is missing. *See Southwestern Bell Telephone Co. v. Brown,* 519 P.2d 491, 495 (Okla.1974).

■ Plaintiff next contends that William Patterson's Fifth Amendment refusal to testify is an admission of fraudulent conduct in Penn Square's dealings with the High Plains limited partners. In the absence of direct evidence of fraud in this case, the Court is unable to manufacture fraud from the silence of a Penn Square loan officer whose actual involvement in the transactions is far from certain.

■ The alleged "understanding" between Penn Square and High Plains does not provide evidence of fraud. If anything, it is evidence that the parties intended in good faith from the beginning to provide financing as represented to the limited partners. The "understanding" was their informal attempt to keep that prospect alive.

Plaintiff would have us read a provision of the Secured Term Loan Agreement incorporating by reference the terms of the Equity Loan Assumption Agreement as contractually binding Penn Square to making the Equity Loan on the terms set out in the Equity Loan Assumption Agreement. (Pltf's. Ex. 5 at 12). The short answer to this argument is that the provision cited is not evidence of fraud. The long answer is that Penn Square is not a party to any contract with plaintiff.[3] The Secured Term Loan Agreement specifically states that "[t]he Bank has not participated in the preparation of the Offering Circular of the Company for the offering of Units in the Partnership, and is not responsible for any statements contained therein or the accuracy or completeness thereof." (Section 8). The Placement Memo further states, "[i]t is

not anticipated that Penn Square will be obligated to or will conduct any due diligence investigations with regard to the terms of this private Placement Memorandum, ... or any other matters except the collateral value of particular letters of credit." (P. 30). Although Swan was a director of Penn Square and the bank worked closely with High Plains on the loan, this is insufficient evidence to hold Penn Square liable for High Plain's breach under any theory of contract law known to this Court. In a similar case involving a partnership formed by Swan, it was held that the partnership and Penn Square were not participating in a joint venture. *In Re Longhorn Securities Litigation,* 573 F.Supp. 255, 273 (W.D.Okla.1983).

The provision plaintiff relies on above, by its plain meaning, only obligates Penn Square to honor the terms of the Equity Loan Assumption Agreement should it ever try to enforce it against plaintiff. Since FDIC claims no rights under the Equity Loan Assumption Agreement, this passage has no bearing on this case.

■ Double collateralization of the rigs presents a separate set of problems. The evidence showed that Penn Square made a $5.5 million loan to High Plains Company on June 5, 1980, for the purpose of constructing two rigs. Those rigs were used as collateral for the loan. On October 29, 1980, those rigs were sold to High Plains. On December 1, 1981, Penn Square consolidated four loans it had made to High Plains into one $8.8 million loan secured by all four rigs and other equipment owned by the partnership. Continental Bank participated in this loan. It was understood by the parties that High Plains Company would use the proceeds of the second loan to pay off the first, but it did not. Again, plaintiff may very well have a contract claim against High Plains and an action for

---

**3.** Although the breach of contract question is not before the Court, there is much evidence to support an argument that there was no breach of contract here. The Placement Memo and Equity Loan Assumption Agreement speak only in anticipatory, not definitive language regarding the Equity Loan. Further, it could be said

that plaintiff agreed to a modification of his contract when he accepted the benefits of the change in the terms of the Equity Loan, i.e., the less costly letter of credit, and release from making quarterly payments of his promissory note.

breach of fiduciary duty against Swan, but plaintiff presents no evidence from which to infer fraud on the part of Penn Square. In fact, plaintiff has provided so little evidence on this matter that the Court is unable to reconstruct the transaction.

The evidence shows that neither loan was paid off and that two rigs have both High Plains and High Plains Company listed as debtors, but that is all that has been proved. Defendant, for its part, has provided evidence that the double collateralization resulted from filing UCC statements under the names of both the partnership and general partner as a precautionary measure. (Cates depo. at 97–102). This is a plausible explanation. The only other evidence on double collateralization is an auditor's tentative report in which he states that the documentation on the $8.8 million loan needs to be resolved. Plaintiff has not provided that resolution. Plaintiff has provided 1982 UCC statements but has given no indication as to what loans the statements are associated. Nor has either party produced the UCC statements or promissory notes for the individual loans that formed the basis for the $8.8 million consolidation. It is possible that the partners of High Plains Company have misused the $5.5 million dollars but plaintiff has not proved it. More importantly, plaintiff has again failed to provide evidence that there was a preconceived plan to defraud the High Plains limited partners or that Penn Square participated in such a plan.

### C.

Plaintiff does assert a contract claim, but only in connection with his alleged position as surety for the Equity Loan. Plaintiff argues that by execution of the Equity Loan Assumption Agreement and the letter of credit, his role in the financing arrangement was that of a surety. Under general suretyship principles, plaintiff claims that the changes in the underlying obligation without his consent released him from his suretyship obligations.

■■■ Under Oklahoma law, there is no distinction between guarantors and sureties. *Central Surety & Ins. Corp. v. Richardson,* 183 Okl. 38, 80 P.2d 663 (1938). A guaranty is defined as "a promise to answer for the debt, default or miscarriage of another person." Okla.Stat. Ann. tit. 15, § 321 (West 1981). A letter of credit is defined as "an engagement by a bank ... made at the request of a customer and of a kind within the scope of this Article (Section 5–102) that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit." *Id.* tit. 12A, § 5–103. The difference lies in the conditions for liability. *Dubuque Packing Co. v. Fitzgibbon,* 599 P.2d 440, 441 (Okla.Ct.App.1979). A guarantor is secondarily liable; his obligation is conditioned upon a default by the principal debtor. *See Reed v. Richards & Conover Hardware Co.,* 188 Okl. 452, 110 P.2d 603 (1941); 38 Am.Jur.2d *Guaranty* § 3 (1968). An issuer of a letter of credit, on the other hand, is primarily liable. His is an independent obligation to honor a draft accompanied by documents complying with the terms of the letter without reference to their compliance to the underlying contract. Okla.Stat.Ann. tit. 12A, § 5–114(1) & Official Comment 1 (West 1981). To require more, would undermine the letter of credit's basic purpose of providing a means of assuring payment cheaply by eliminating the need for the issuer to police the underlying transaction. *Wichita Eagle & Beacon Publishing Co. v. Pacific Nat. Bank,* 493 F.2d 1285, 1286 (9th Cir.1974).

■■■ A review of the documentation in this case confirms that plaintiff's letter of credit is indeed a letter of credit and that plaintiff was not a guarantor. The letter of credit authorizes a draw on plaintiff's account upon the presentation of a sight draft and a signed letter certifying the holder's specific reasons entitling him to draw.[4] There is no indication that payment

---

**4.** The following constitutes the entire letter of credit.

We hereby authorize you to draw on The Central Trust Company, N.A., at sight for account of Marvin L. Warner up to an aggregate

was conditioned on the default of any principal. Thus it stands in stark contrast to the document in *Dubuque Packing.* There, an Oklahoma appellate court held a letter that used the word "guaranty" four times and looked to default on the part of a principal as a condition to payment was a guaranty. 599 P.2d 440 (Okla.Ct.App. 1979). Here, we have a classic letter of credit unencumbered by any language or conditions of suretyship. The parties were thus correct in treating it as such.

More fundamentally, however, plaintiff was not a guarantor because he did not promise to answer for the debt of another person. The debt was his own. Under the financing scheme set out in the Placement Memo and elected by all of the limited partners, the Equity Loan was a loan obtained by High Plains for the limited partners to allow them to finance half of their partnership contribution. High Plains acted as their agent in obtaining the loan but it was at all times the limited partners' loan. Plaintiff's characterization as principal debtor is supported by the Equity Loan Assumption Agreement whereby plaintiff "unconditionally assumes the obligations of the Partnership to pay all sums of principal, now or hereafter due with respect to the Equity Loan, provided, however, that the liability of the undersigned hereunder shall not in any event exceed his pro rata share of the Equity Loan." It is therefore the holding of the Court that plaintiff was not a guarantor of the Equity Loan and that the letter of credit was properly paid.

### D.

FDIC has asserted a counterclaim for plaintiff's pro rata share of the Working Capital Loan, interest lost on the letter of credit from October 13, 1982 when FDIC demanded payment until September 13, 1983 when it was paid, and the fees and costs incurred in enforcing the Working Capital Assumption Agreement.

In addition to the Subscription Agreement, plaintiff executed a Working Capital Assumption Agreement whereby he personally and unconditionally assumed liability for his pro rata share of High Plains's $693,000 working capital loan including interest and charges. The full amount is in default. Plaintiff does not dispute the validity of this contract. Instead, he justifies his withholding payment on an alleged right of set off against any recovery he might realize on his claims. (Reply to Counterclaim doc. no. 80). Since those claims have been rejected, plaintiff must now pay FDIC his $103,950 pro rata share of the working capital loan along with interest due pursuant to the Working Capital Assumption Agreement.

 The Agreement also contains a provision whereby plaintiff agreed to reimburse Penn Square for attorneys' fees and costs incurred in its enforcement. (FDIC Ex. A at 25). Such provisions are recognized as valid by Oklahoma courts. *See e.g., Kemp v. Metz,* 197 Okl. 25, 168 P.2d 107, syllabus (1946); *Webster Drilling Co. v. Walker,* 286 F.2d 114, 117 (10th Cir. 1961); *Security Nat. Bank v. Bonnett,* 623 P.2d 1061, 1064 (Okla.Ct.App.1980). The determination of the reasonableness of those fees, however, is within the discretion of the Court. *State ex rel. Burk v. City of Oklahoma City,* 598 P.2d 659, 663 (Okla. 1979). Counsel for FDIC is directed to present this Court within 30 days of the

amount of Two Hundred Forty-Nine Thousand Seventy-Five and 00/100 United States Dollars ($249,075.00).

Drafts to be accompanied by: this letter and your signed statement certifying that you are entitled to draw under this letter specifying the specific reason(s) for the draw.

This Letter of Credit expires on October 31, 1982. This Letter of Credit is automatically extended for a period of one year from the above referenced maturity date unless 30 days prior to such maturity date we notify you in writing that we choose not to extend said credit. In any event, this Letter of Credit will expire not later than October 31, 1984.

This Letter of Credit is transferable and assignable in its entirety to a state or national bank upon 30 days prior written notice by Central Trust Co., N.A.

This credit is subject to the "Uniform Customs and Practice for Documentary Credits" (1974 Revision) of the International Chamber of Commerce Publication No. 290.

date of this filing, a sufficiently detailed account of his time expended in order that an award in accordance with the strictures of *Northcross v. Board of Education of Memphis City Schools,* 611 F.2d 624 (6th Cir.1979), may be made. Counsel's attention is drawn to this Court's General Order on Attorney Fees, Section V of the Pre-Trial Packet as revised June, 1984.

■ FDIC's final claim is for pre-judgment interest from October 13, 1982 when it demanded payment of the letter of credit until September 13, 1983 when the money was actually received. Oklahoma law provides that "[t]he detriment caused by the breach of an obligation to pay money only is deemed to be the amount due by the terms of the obligation, with interest thereon." Okla.Stat.Ann. tit. 23, § 22 (West 1981).

Any person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except such time as the debtor is prevented by law, or by the act of the creditor from paying the debt.

*Id.* § 6. The Court finds these statutes applicable here. Plaintiff is therefore liable to FDIC for interest on $249,075 from October 13, 1982 to September 13, 1983 at 15%. Okla.Stat.Ann. tit. 12, § 727 (West 1983–84).

### III. Conclusions of Law

(A) This Court has jurisdiction pursuant to 12 U.S.C. § 1819 (1982).

(B) Oklahoma law supplies the rule of decision.

(C) Plaintiff has failed to prove by a preponderance of the evidence that Penn Square defrauded him into investing in High Plains.

(D) Plaintiff was not a guarantor of the Equity Loan.

(E) The letter of credit was properly honored.

(F) Plaintiff is in breach of the Working Capital Assumption Agreement.

(G) In accordance with the foregoing, plaintiff's claims are hereby DENIED. FDIC's counterclaim is hereby GRANTED. It is awarded $103,950 on the Working Capital Assumption Agreement, attorneys' fees and costs thereon, together with interest on $249,075 from October 13, 1982 to September 13, 1983 at 15%.

IT IS SO ORDERED.