Marvin L. WARNER, Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant.

Civ. No. C–1–82–1081.

United States District Court,
S.D. Ohio, W.D.

Oct. 5, 1987.

Kevin Irwin, Louis Gilligan, Cincinnati, Ohio, for plaintiff.

Gerald Baldwin, Michael Zavatsky, W. Stuart Dornette, Cincinnati, Ohio, for defendant.

---

## ORDER

CARL B. RUBIN, Chief Judge.

This matter is before the Court upon remand from a decision of the United States Court of Appeals for the Sixth Circuit on August 11, 1986. *Warner v. Central Trust Co.*, 798 F.2d 167 (6th Cir.1986). This Court entered Findings of Fact, Opinion and Conclusions of Law on December 7, 1984. *Warner v. Federal Deposit Ins. Corp.*, 605 F.Supp. 521 (S.D.Ohio 1984). That decision was appealed and two issues have been presented upon remand for consideration consistent with the Sixth Circuit opinion. The first question is in regard to the Equity Loan Assumption Agreement between Warner and the High Plains Drilling Partners 1980–II (the "Partnership"). The narrow issue to be addressed is whether Warner knew or had reason to know of the alterations of the Equity Loan and through his silence, assented to the changes.

Secondly, a question has arisen concerning the award of interest on the Working Capital Loan of which Warner had assumed a pro rata share. This issue concerns whether the affidavit of A.L. "Jack" Cranfill, which states the contract rate and interest due for the period between the dates of trial and judgment entry, was overlooked or was considered but found to be insufficient proof for the interest award.

These issues were presented to the Court in trial briefs filed on August 10, 1987. Defendant Federal Deposit Insurance Corporation has additionally resubmitted its motion for attorney fees and expenses of January 4, 1985. In accordance with Fed. R.Civ.P. 52 the Court submits herewith its findings of Fact, Opinion and Conclusions of Law.

## I. Findings of Fact [1]

(1) In the fall of 1980, plaintiff, Marvin Warner, an investor experienced in banking and real estate, agreed to purchase an interest in a limited partnership known as High Plains Drilling Partners 1980–II, Ltd. ("High Plains"). The partnership intended to purchase and lease four oil drilling rigs.

(2) The partnership was put together by Carl Swan, Chairman of the Board and a Director of High Plains Company, an Oklahoma corporation that acted as the general partner of High Plains.

(3) Plaintiff purchased 15 limited partnership units representing 15% of the partnership. The total purchase price was $498,150. Plaintiff was given the option of paying the entire amount in cash and short-term notes or paying half in cash and short-term notes and the other half through a complex financing arrangement whereby High Plains borrowed the partners' contributions from Penn Square Bank, N.A. ("Penn Square") secured by irrevocable standby letters of credit, promissory notes, and loan assumption agreements in favor of High Plains. All of the limited partners elected the latter option. The loan thus obtained was known as the "Equity Loan."

(4) A Private Placement Memorandum ("Placement Memo") described the arrangement (Pltf's. Ex. 1). It indicated that the limited partners' promissory notes would be payable in quarterly installments over four years. Proceeds from these payments would be used to repay the Equity Loan from Penn Square. The memo anticipated that such loan would likewise be due in quarterly installments and would bear a floating interest rate of three and one-half percent over Penn Square's prime rate.

(5) The Placement Memo required that the letter of credit extend to June 30, 1985 and over 110% of the principal amount of the limited partners' promissory notes.

(6) In the Placement Memo and in the Subscription Agreement (FDIC Ex. A) whereby plaintiff actually purchased his partnership interest, Plaintiff was expressly warned about the speculative nature of the investment and the "high degree of risk of loss" involved.

---

1. Since this matter has pended for five years a complete restatement of facts found by the Court appears appropriate.

(7) The Subscription Agreement required as part of the loan purchase option a letter of credit on the same terms as those stated in the Placement Memo.

(8) On October 29, 1980, plaintiff executed the Subscription Agreement along with a Power of Attorney, a promissory note for $249,075 payable in accordance with the terms set out in the Placement Memo, an Equity Loan Assumption Agreement, and a Working Loan Assumption Agreement.

(9) Under the Equity Loan Assumption Agreement, plaintiff agreed to assume personal liability for a pro rata share of High Plains's $1,660,500 Equity Loan from "a national commercial bank." The terms of the Equity Loan were to be the same as those set out in the Placement Memo. Plaintiff also agreed under the Equity Loan Assumption Agreement to execute a letter of credit in the amount of 110% of the principal amount of his share of the Equity Loan as security for the loan.

The Equity Loan Assumption Agreement contained the statement that the lender was not a party to it nor had the lender any obligations thereunder. The Subscription Agreement and the Placement Memo each stated that Penn Square was looking to the limited partners' letters of credit as the primary security for the Equity Loan. (FDIC Ex A at 33; Pltf's Ex. 1 at 10).

(10) On December 30, 1980, High Plains and Penn Square entered into a Secured Term Loan Agreement for the Equity Loan. The terms of this $1,660,500 Equity Loan were different from those represented to plaintiff in the Placement Memo and Equity Loan Assumption Agreement. Instead of a 48–month, three and one-half percent over prime loan payable in quarterly installments, the actual loan was for 19 months, with interest at one and one-half percent over prime, and the entire principal payable on August 15, 1982.

(11) The letters of credit demanded by the Secured Term Loan Agreement were also different. They were to cover only 100% of the principal amount instead of 110%. (Pltf's. Ex. 5 at 12).

(12) The actual terms of the Equity Loan differed from those represented in the Placement Memo and the Equity Loan Assumption Agreement because banks were reluctant to issue the limited partners letters of credit for longer than two years. As a result, most limited partners could not obtain 48–month letters of credit. Since Penn Square refused to make High Plains an unsecured loan, the parties to the Equity Loan restricted it into a 19–month "bullet loan" at a lower interest rate and adjusted the letter of credit and promissory note requirements accordingly.

(13) There was an "understanding" among the parties that at the end of the 19 months the Equity Loan would be rolled over and letters of credit would be renewed for another two years. Most of the Equity Loan was later sold to Continental Bank, N.A. of Illinois.

(14) In a letter dated November 13, 1980, plaintiff was informed of the financing problem by Brent Davis, Vice President of High Plains, and advised to have his bank prepare a two-year letter of credit on Penn Square for $249,075. Plaintiff ordered Central Trust Company, N.A. of Cincinnati ("Central Trust") accordingly and the letter issued December 9, 1980.

(15) The actual Equity Loan did not require quarterly payments as had been anticipated by the Placement Memo and Equity Loan Assumption Agreement and as a result plaintiff was informed that he was not required to make quarterly payments on his promissory note to High Plains as its terms indicated.

(16) During the course of 1981, High Plains prospered. Its rigs experienced a utilization rate of 97.5%. By December of 1982, however, the demand for rigs had dropped dramatically and none were in operation. (Novakowski Depo. at 137).

(17) High Plains defaulted on the Equity Loan when it came due August 15, 1982.

(18) On July 5, 1982, pursuant to 12 U.S.C. § 1291, the Comptroller of the Currency determined that Penn Square was insolvent. Defendant, the Federal Deposit Insurance Corporation ("FDIC"), was ap-

pointed Receiver of Penn Square and now stands in its shoes.

(19) On October 13, 1982, the FDIC notified Central Trust of its intent to call plaintiff's letter of credit. After legal proceedings in the Common Pleas Court of Hamilton County, the United States District Court for the Southern District of Ohio, and the United States Court of Appeals for the Sixth Circuit, Central Trust honored the letter of credit on September, 1983.

(20) FDIC is the only remaining defendant in the case.

## II. Opinion

A. The United States Court of Appeals for the Sixth Circuit stated in its opinion (798 F.2d at 170).

"We need not decide ... between agency or guarantor arguments, for whether Warner was a guarantor of the Partnership debt to Penn Square or whether Warner was the principal on the loan and the Partnership his agent, the outcome in this case is the same."

In its previous ruling of December 7, 1984, this Court determined Warner was not a guarantor. 798 F.2d at 171. The Sixth Circuit acknowledged this determination yet additionally noted that an ultra vires act of an agent can still bind the principal if the latter assented to, or ratified, the unauthorized agreement. 798 F.2d at 171 quoting Restatement (Second) of Agency §§ 143, 82, 94. Thus the narrow question upon remand is whether Warner knew or had reason to know of the alteration of the Equity Loan and through his silence, assented to the changes.

Plaintiff Warner asserts to this Court that he did not possess knowledge of the material changes and therefore could not have ratified them. (Plaintiff Tr. Brief at 7) Plaintiff's basis to support this argument is that Warner did not even learn of the material changes in the Equity Loan until after August of 1982, when Penn Square became insolvent and was taken over by the FDIC. (Plaintiff Trial Brief at 15) Therefore since Warner neither knew nor should have known of the changes, no ratification occurred.

Conversely, defendant FDIC contends by virtue of the signed Power of Attorney in the Placement Memo and the separate Power of Attorney executed in the Equity Loan Assumption Agreement, the partnership was authorized to act on Warner's behalf in all matters relating to the partnership financing. (Defendant Trial Brief at 8)

The foundation of this opinion is based upon the principles of agency. The primary focus is ratification of the terms of the Equity Loan. Ratification in agency is an adoption or confirmation by one person of an act performed on his behalf by another. The substance of the doctrine is the confirmation after conduct. In Re Brown, 412 F.Supp. 1066, 1071 (W.D.Okl.1975). The essential elements of ratification are; (1) acceptance by the principal of the benefits of the agent's acts (2) with full knowledge of the facts, and (3) circumstances or affirmative election indicating an intention to adopt the unauthorized arrangement. Id.

The Oklahoma Supreme Court supports the view that one who accepts the benefits of the unauthorized acts of his agent ratifies those acts and accepts all the burdens and benefits of those acts. C.H. Stuart Inc. v. Bennett, 617 P.2d 879 (1980). Furthermore, it is not essential to ratification that the principal have knowledge of the acts of the agent if the benefits from those acts are retained, after the happening of events that would place a reasonable prudent person on inquiry. Id. See also Guaranty Bank and Trust Co. v. Federal Reserve Bank, 454 F.Supp. 488 (W.D.Okl. 1977).

The United States Court of Appeals for the Tenth Circuit long ago established this latter principle and further stated that when a principal remains silent and acquiesces for a reasonable time, he will be presumed to have ratified such unauthorized acts. Alexander v. Phillips Petroleum, 130 F.2d 593, 604 (10th Cir.1942). The Tenth Circuit also concluded that under Oklahoma law, acts of a principal are to be liberally construed in favor of an adoption

of the acts of his agent. See also *City National Bank and Trust Co. v. Finch*, 205 Okl. 340, 237 P.2d 869 (1951).

Clearly Mr. Warner received benefits under the terms of the Secured Term Loan entered into by High Plains and Penn Square which varied from those provisions in the Placement Memo and Subscription Agreement. A brief review of the facts reveals that instead of a 48 month three and one-half percent over prime loan payable in quarterly installments, the actual loan was for 19 months with interest at one and one-half percent over prime and the entire principal payable on August 15, 1982. The letters of credit which were demanded by the Secured Term Loan were also different.[2] These letters covered only 100% of the principal amount instead of the 110% requested under the Placement Memo and Subscription Agreement.

Since these unauthorized acts resulted in benefits to plaintiff Warner, if these benefits were retained by Mr. Warner after a reasonably prudent person would have been on inquiry or naturally speak, ratification is deemed to have occurred.

During Mr. Warner's testimony, he was questioned on direct examination whether:

"As a banker, in the event the Partnership entered into [a] sixteen installment payment type of note with Penn Square would it have been brought to your attention back in September of 1981, when the first payment was due if in fact the partnership hadn't paid the bank?" Warner testimony at 38 (Doc. no. 24)

By answering in the affirmative Mr. Warner explained that this type of situation is a "red flag" which alerts everybody involved that something is wrong. (Warner testimony at 38) (Doc. no. 24). Mr. Warner further testified that it had been indicated to him that the first installment of September 1, 1981 of the obligation High Plains had to Penn Square was current.[3] *Id.*

In fact Mr. Warner had also attempted to make one of his quarterly payments during the course of his dealings with High Plains and was informed the funds were not needed.[4] (Warner testimony at 25, 26)

Since Mr. Warner cannot be considered an unsophisticated investor, the difference in the terms of the agreement and the discrepancies in installment payments are sufficient to put a reasonably prudent person on inquiry. Due to Mr. Warner's retention of the aforementioned benefits, his silence and acquiescence are adequate to constitute ratification of High Plains unauthorized acts.

B. The second issue presented upon remand to this Court is clarification of the rate applied to the award of interest on the Working Capital Loan of which Warner assumed a pro rata share. The amount of the interest plus penalties due under the contract at the time of trial totals $51,296.51. One hundred and two days elapsed between the trial and the date of final judgment entry. As the Court held in its order of May 21, 1985, defendant is entitled to the contract rate of interest and penalty during this time which totals $5,561.04 (Affidavit of A.C. Jack Cranfill doc. no. 104). Thus the sum of interest and penalty equals $56,857.55.

C. Finally, defendant Federal Deposit Insurance Corporation has resubmitted its motion of attorney's fees and expenses dated January 4, 1985. (Doc. No. 91) On December 7, 1984 this Court granted FDIC's counterclaim on the Working Capital Assumption Agreement together with attorney's fees and costs. *Warner v. FDIC*, 605 F.Supp 521 (S.D.Ohio 1984). FDIC had submitted their application for attorney's fee while this matter was on appeal before the United States Court of

---

**2.** The Sixth Circuit notes that Mr. Warner was informed of the change in the letter of credit requirements 798 F.2d at 170.

**3.** The Sixth Circuit also acknowledges that since the partnership was not required to make quarterly principal payments on the Equity Loan, the partnership told Mr. Warner he did not need to make such payments to the partnership as required by the Equity Loan Assumption Agreement. 798 F.2d at 170.

**4.** Mr. Warner had sent High Plains a check which was returned to him. (Warner testimony at 25, 26 doc. no. 24)

Appeals for the Sixth Circuit. Accordingly, the motion was denied without prejudice for resubmission. Defendants request attorney fees totalling $6,714 and expenses in the amount of $1,316.61. This Court finds that in view of the history of this case including three hearings, two appeals and numerous filings that such application is appropriate.

### III. Conclusions of Law

A. Plaintiff retained benefits and assented to the terms of the Equity Loan through his silence and acquiescence.

B. The award of interest on the Working Capital Loan totals $56,857.55.

C. Defendant's FDIC are awarded attorney fees in the amount of $6,714 and expenses of $1,316.61.

IT IS SO ORDERED.